**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

NOVA LAND CREATIONS, LLC and LEE ANN SIEGRIST,

Plaintiffs,

-against-

NITRO ADVANCE; JONATHAN "BENJAMIN" GREENWALD; ROCKET CAPITAL NY LLC; TZVI ROSENBLUM; STRIKE RECOVERY GROUP, INC.; IMMEDIATE CAPITAL SOLUTIONS LLC d/b/a IMMEDIATE ADVANCES; MARLEN KRUZHKOV; CFG MERCHANT SOLUTIONS, LLC; ANDREW COON; WILLIAM GALLAGHER; 968 W VETERANS REALTY LLC d/b/a ASPIRE FUNDING PLATFORM; DANIEL LENEFSKY; ARCADIA SERVICING INC.; JOSHUA KARP; GLOBAL MERCHANT CASH, INC. d/b/a WALL STREET FUNDING; JAY KELLER; and JOHN AND JANE DOE SYNDICATES 1–50,

Defendants.

Case No.: _______________

**COMPLAINT**

## COMPLAINT

Plaintiffs Nova Land Creations, LLC ("Nova Land") and Lee Ann Siegrist ("Siegrist" and, together with Nova Land, "Plaintiffs"), by their attorneys, Heskin & Proper, PLLC, allege against Defendants Nitro Advance ("Nitro"), Rocket Capital NY LLC ("Rocket"), Immediate Capital Solutions LLC d/b/a Immediate Advances ("Immediate"), CFG Merchant Solutions, LLC ("CFG"), 968 W Veterans Realty LLC d/b/a Aspire Funding Platform ("Aspire"), Arcadia Servicing Inc. ("Arcadia"), Global Merchant Cash, Inc. d/b/a Wall Street Funding ("Global" and, together with Nitro, Rocket, Immediate, CFG, Aspire, and Arcadia, the "Funder Defendants"), Strike Recovery Group, Inc. ("Strike"), Jonathan "Benjamin" Greenwald, Tzvi Rosenblum, Marlen Kruzhkov, Andrew Coon, William Gallagher, Daniel Lenefsky, Joshua Karp, and Jay Keller (collectively, the "Individual Defendants"), and John and Jane Doe Syndicates 1–50 (the

"Doe Syndicates" and, collectively with the other defendants, "Defendants"), upon knowledge as to their own acts and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1. Nitro and its collection arm, Strike, opened their collection campaign by broadcasting threats to Siegrist's family. Strike sent its August 11, 2026 ultimatum to more than two dozen addresses, including Siegrist's children, former husband, her son's girlfriend, other relatives, and acquaintances—people with no contractual obligation and no legitimate role in collecting Nova Land's receipts.

2. The family dissemination was designed to embarrass and humiliate Siegrist and to extort payment through personal pressure. The ultimatum threatened within twenty-four hours to "freeze [Nova Land's] operational cash flow," halt its daily operations, destroy its ability to borrow, trade, or process payments, and begin liquidating its assets.

3. Nitro and Strike did not merely threaten to destroy Nova Land. They followed through by using UCC and account-debtor pressure that caused D.R. Horton to withhold approximately $40,000, remove Nova Land from active projects, and block Nova Land from future work. D.R. Horton had generated approximately $3.11 million in historical sales for Nova Land and represented more than $1 million in expected annual revenue.

4. Ten days later, Aspire supplied a second, unusually candid admission of how these obligations were treated. On August 21, 2026, Aspire's automated system reported that one scheduled $9,316.83 payment had been returned on August 19 with code R01 for insufficient funds.

5. Aspire's automatically generated email declared: "Bouncing payments for this reason is a breach of your obligations." It threatened escalation to Aspire's in-house legal team

for "default and breach of contract," added a $35 insufficient-funds fee, and commanded Nova Land to "[m]ake sure funds are available so that the next payment does not bounce."

6. Only after declaring breach and threatening default over that single missed fixed payment did the automated email mention reconciliation, and then only if Nova Land supplied two full months of bank statements plus month-to-date statements. Because the message was automatically generated, it reflects Aspire's programmed collection policy—not an isolated collector's improvised language.

7. The Nitro family campaign and Aspire default email expose the transactions' substance. A purchaser of a fluctuating percentage of future receipts assumes that receipts may fall or fail to materialize. These funders instead treated each scheduled debit and the full purchased amount as absolutely repayable, using default, guaranty, lien, account-debtor, and reputational remedies when the purchased risk became real.

8. This action concerns seven transactions labeled purchases of future receipts but structured and enforced as short-term loans: Immediate, Nitro, CFG, Rocket, Aspire, Arcadia, and Global. Their written terms required $2,104,406.95 in purported purchased amounts in exchange for stated purchase prices totaling $1,496,237.11, with approximately $1,226,526 in new cash reaching Nova Land after fees and CFG's refinancing deduction.

9. Each Funder Defendant acted through one or more controlling individuals who set or approved underwriting standards, fixed-payment terms, default policies, reconciliation practices, servicing instructions, and collection remedies. Those individuals were not passive owners: they had ultimate or high-level authority over the enterprises that originated and collected the challenged obligations and personally operated or managed those enterprises through those policies and decisions.

10. The Funder Defendants also obtained necessary deal capital from undisclosed syndicators and participants. The Doe Syndicates funded or purchased participation interests in the challenged transactions, expected returns derived from the fixed purchased amounts and fees, received transaction and performance information, and enabled the Funder Defendants to originate and collect the loans. Their identities, percentages, communications, and distributions are uniquely within Defendants' possession and will be established through discovery.

11. Each transaction imposed a fixed periodic withdrawal that mathematically produced a finite term. The conservative annualized simple rates were approximately 132% for Immediate, 347% for Nitro on its weekly schedule, at least 65% for CFG even using its full stated purchase price, 81% for Rocket, 143% for Aspire, 115% for Arcadia, and 32% for Global—all above the applicable criminal-usury ceilings.

12. Nova Land's downturn was the very risk the Funder Defendants claimed to purchase. A general contractor failed to pay nearly $1 million as promised. Nova Land consequently could not pay subcontractors and suppliers, liens were recorded against affected properties, and Nova Land was forced into litigation against the general contractor.

13. Nova Land repeatedly informed the Funder Defendants, directly and through its negotiator, that receivables had sharply decreased, the large contractor receivable remained unpaid, and available operating cash could not sustain their dictated fixed payments. They nevertheless demanded fixed remittances and full balances.

14. By August 2026, seven cumulative MCA obligations, delayed receipts, lost customer revenue, delayed asset-sale proceeds, and continuing payroll, insurance, equipment, vendor, and project expenses had created an acute liquidity crisis. Nova Land remained an

operating business with active projects, equipment, receivables, and other assets, but lacked cash to satisfy every fixed demand as it came due.

15. Plaintiffs seek recharacterization of the seven transactions as loans; declarations under New York law and, as to Aspire and Immediate, alternatively under their selected Florida law; cancellation of guaranties, liens, ACH authorizations, and account-debtor notices; injunctive relief; RICO damages for collection of unlawful debt; damages for interference; restitution; an accounting; and other relief.

## **PARTIES**

16. Plaintiff Nova Land is a Florida limited liability company with its principal place of business at 9914 State Road 52, Hudson, Florida 34669. It supplies and coordinates labor, materials, equipment, and construction services for developers, general contractors, and other commercial customers in interstate commerce.

17. Plaintiff Siegrist is a Florida resident, Nova Land's owner, and the individual guarantor named in the challenged agreements.

18. Defendant Nitro transacts business as "Nitro Advance" and lists its principal New York office at 29 West 36th Street, New York, New York 10018.

19. Nitro identifies no entity suffix in its agreement. Upon information and belief, the persons or entities operating under that name are located in New York, made underwriting and collection decisions in New York, accepted the agreement in New York, and received payments in New York. Their precise legal identity is uniquely within Nitro's knowledge and will be confirmed in discovery.

20. Defendant Rocket is a limited liability company that holds itself out as "Rocket Capital NY LLC." Rocket's agreement represents that Rocket is located in New York, makes

decisions in New York, forms its agreements in New York, and receives payments in New York. Rocket also uses an administrative address in Aventura, Florida.

21. Defendant Strike holds itself out as "Strike Recovery Group, Inc." and operates from 1411 Broadway, 29th Floor, New York, New York 10018. Strike acted as Nitro's collection arm, received Nitro's collection file and debtor information, and designed and executed collection activity on Nitro's behalf.

22. Defendant Immediate is a Delaware limited liability company doing business as Immediate Advances, with an address at 2875 Northeast 191st Street, Suite 704, Aventura, Florida 33180.

23. Defendant CFG is a Delaware limited liability company with an address at 32 Old Slip, Suite 600, New York, New York 10005.

24. Defendant Aspire is 968 W Veterans Realty LLC, doing business as Aspire Funding Platform, with an address at 50 Tice Boulevard, Woodcliff Lake, New Jersey 07677.

25. Defendant Arcadia holds itself out as Arcadia Servicing Inc., with a contractual address at 99 Washington Avenue, Suite 700, Albany, New York 12260.

26. Defendant Global is Global Merchant Cash, Inc., doing business as Wall Street Funding, with an address at 64 Beaver Street, Suite 415, New York, New York 10004.

27. Upon information and belief, each Funder Defendant is regularly engaged in advancing money through standard-form MCA agreements and collecting amounts exceeding lawful interest limits when the transactions are judged by their real character.

28. Defendant Jonathan "Benjamin" Greenwald is, upon information and belief, a founder, member, manager, principal, or other controlling person of the business operating as Nitro Advance. Public litigation identifies Timeless Funding LLC as doing business as Nitro

Advance and other public litigation identifies Nitro Advance Inc. as doing business under the same name. Greenwald's precise ownership and management relationship to those entities is within Defendants' exclusive knowledge. He exercised ultimate or high-level authority over Nitro's underwriting, pricing, reconciliation, servicing, default, and collection policies, including the decision to employ and direct Strike.

29. Defendant Tzvi Rosenblum is Rocket's publicly identified manager. Rosenblum exercised ultimate or high-level authority over Rocket's underwriting, pricing, reconciliation, servicing, default, syndication, UCC, and account-debtor collection policies.

30. Defendant Marlen Kruzhkov is Immediate's publicly identified authorized member and signed Immediate's 2026 Florida annual report as a member. Kruzhkov exercised ultimate or high-level authority over Immediate's underwriting, pricing, reconciliation, servicing, default, syndication, and collection policies.

31. Defendant Andrew Coon is CFG's publicly identified chief executive officer. Coon exercised ultimate executive authority over CFG's underwriting, pricing, reconciliation, servicing, default, syndication, and collection policies.

32. Defendant William Gallagher is CFG's founder, president, and managing partner. Gallagher exercised ownership and management authority over CFG's origination, underwriting, pricing, reconciliation, servicing, syndication, and collection practices.

33. Defendant Daniel Lenefsky is Aspire's chief executive officer and executed a June 2026 regulatory consent order on Aspire's behalf in that capacity. Lenefsky exercised ultimate executive authority over Aspire's underwriting, pricing, automated-payment, reconciliation, default, syndication, and collection policies, including the programmed policy reflected in Aspire's August 21, 2026 automated default email.

34. Defendant Joshua Karp is Arcadia's publicly identified chief operating officer. Karp exercised operational authority over Arcadia's underwriting, pricing, payment processing, reconciliation, servicing, default, syndication, and collection practices.

35. Defendant Jay Keller is Global's founder and chief executive officer. Keller has submitted affidavits for Global in receivables-purchase enforcement actions and exercised ultimate authority over Global's underwriting, pricing, reconciliation, servicing, default, syndication, and collection practices.

36. Defendants John and Jane Doe Syndicates 1–50 are individuals, entities, funds, special-purpose vehicles, or participant groups whose identities are presently unknown. They supplied some or all of the capital necessary to fund one or more challenged transactions, purchased direct or indirect participation interests, shared in collections and fees, and associated with the applicable Funder Defendant and its controlling individuals for the common purpose of originating, administering, and collecting the challenged obligations.

37. The Individual Defendants and Doe Syndicates are sued for their own conduct in operating or managing the relevant enterprises and collecting or enabling collection of unlawful debt, not merely because of their titles, ownership interests, or association with a corporation.

## JURISDICTION AND VENUE

38. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs assert claims under 18 U.S.C. §§ 1962(c) and 1964(c).

39. This Court has authority to declare the parties' rights under 28 U.S.C. §§ 2201 and 2202 and supplemental jurisdiction over the related state-law claims under 28 U.S.C. § 1367.

40. Nitro, Rocket, CFG, Arcadia, and Global are located in New York, selected New York law or forums, accepted or serviced their transactions in New York, received or sought

payments in New York, or used New York-centered UCC and collection remedies. Strike operates in this District and directed Nitro's collection campaign from here.

41. At least Nitro, Strike, CFG, and Global are found, reside, transact affairs, or have an agent in this District within 18 U.S.C. § 1965(a).

42. Personal jurisdiction over the remaining Defendants is also proper under 18 U.S.C. § 1965(b). The ends of justice require nationwide service because this action concerns interrelated extraction from one merchant by seven concurrent MCA obligations, and the agreements do not select a single state-law forum in which all parties and the exclusively federal RICO claims can be resolved together. *PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65, 71–72 (2d Cir. 1998).

43. The Individual Defendants purposefully directed the challenged funding, ACH, default, UCC, servicing, and collection activity into New York and Florida, operated or managed enterprises transacting affairs in this District, or are subject to nationwide service under 18 U.S.C. § 1965(b). The Doe Syndicates are subject to jurisdiction to the same extent based on the transactions and enterprises in which they participated.

44. Venue is proper under 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b) because multiple Defendants reside or transact affairs in this District and a substantial part of the underwriting, acceptance, payment receipt, and collection activity occurred here.

45. Rocket's form agreement states that litigation must be maintained in a New York state court. Plaintiffs challenge that clause as part of a void, criminally usurious instrument. The clause cannot require waiver of an exclusively pleaded federal RICO remedy, and enforcing it here would contravene the strong federal policy embodied in 18 U.S.C. § 1964(c).

46. Immediate's and Aspire's forms select Florida law and forums. Plaintiffs plead Florida usury law against those Defendants in the alternative. No agreement supplies a forum in which the entire controversy and the federal RICO claims may be resolved.

## FACTUAL ALLEGATIONS

### A. Nova Land's Business, Customer Relationships, and Financial Distress

47. Nova Land operates a construction-related business that supplies and coordinates labor, materials, equipment, and related services for projects performed for developers, general contractors, and other established counterparties, including D.R. Horton and Locust Branch.

48. D.R. Horton was a committed, multi-year customer and treated Nova Land as an approved vendor. Nova Land's records reflect approximately $3,111,197.10 in historical D.R. Horton sales.

49. Based on that history, Nova Land reasonably expected the D.R. Horton relationship to generate approximately $1.037 million in annual revenue, subject to project availability and performance.

50. Nova Land also has a contractual and business relationship with a general contractor concerning a substantial disputed receivable. The general contractor failed to pay nearly $1 million as promised, even though Nova Land had incurred obligations to subcontractors and suppliers in performing the underlying construction work.

51. The general contractor's nonpayment caused an immediate and material downturn in Nova Land's receipts. Nova Land lacked operating cash to pay subcontractors and suppliers, and those unpaid parties recorded liens against affected properties.

52. Nova Land commenced or prepared litigation against the general contractor to recover the unpaid receivable. The claim remained disputed and uncollected when the fixed MCA withdrawals came due.

53. Nova Land's resulting condition was a severe liquidity and cash-flow crisis, not an absence of business activity or assets. Nova Land continued to possess and operate projects, equipment, receivables, and other assets, but its available cash and currently collectible revenue were insufficient to satisfy all obligations as they became due.

54. Nova Land then had seven MCA agreements. Their cumulative payment requirements had placed substantial pressure on operating cash flow before Nova Land became unable to continue MCA payments for several weeks.

55. Nova Land lacked sufficient available cash to satisfy the MCA demands while also meeting payroll, insurance, equipment and vehicle financing, vendor obligations, project expenses, and the other costs necessary to continue operating.

56. Expected cash inflows were delayed or uncertain. Nova Land awaited a significant project deposit associated with the Silk Oak project and attempted to generate liquidity by selling equipment, including a Mack truck and trailers, but difficulties completing the contemplated sale delayed the anticipated proceeds.

57. Nova Land experienced delays funding employee payroll and actively sought funds and asset-sale proceeds to pay employees. Several employees resigned or requested leaves of absence as the crisis deepened, reducing Nova Land's capacity to maintain normal field and administrative operations.

58. Both members of Nova Land's administrative office staff resigned. Management was forced to assume responsibility for accounting, QuickBooks, accounts receivable, accounts payable, payroll administration, employee benefits, human resources, permitting, customer communications, and vendor matters while also attempting to stabilize the business.

59. Insurance, equipment-financing, vehicle, and other operating obligations continued to accrue, and certain insurance policies faced cancellation if payments were not made by required deadlines. Those obligations made immediate access to operating cash essential to Nova Land's continued performance of active projects.

60. Nova Land took active steps to preserve the company as a going concern by pursuing receivables and project deposits, attempting to sell equipment and other assets, reducing expenses, addressing insurance and financing obligations, reconstructing accounting records after the administrative departures, and retaining counsel and a negotiator to address the MCA claims.

61. Nova Land disclosed the downturn to its MCA funders. It explained that the large general-contractor receivable had not been paid, that Nova Land was pursuing litigation, that expected receipts had fallen, that available funds could not cover the fixed withdrawals, and that Nova Land needed the withdrawals reduced or paused until receipts recovered.

62. Nova Land made those communications directly and through National Capital Negotiators, which Nova Land retained to contact and negotiate with all seven MCA funders.

63. Those disclosures presented the precise business-performance contingency that distinguishes a true purchase of future receipts from a loan: if the Funder Defendants had purchased a percentage of receipts, their remittances and recovery would decline with Nova Land's actual receipts, and they would bear the risk that the purchased amount might never be collected.

64. Instead, after learning that the downturn had become real, the Funder Defendants continued to demand fixed payments and full balances and escalated to guaranties, fees, UCC

remedies, account-debtor diversion, and collection agents. Their actual conduct placed the risk of nonpayment entirely on Nova Land and made repayment absolute.

65. Defendants obtained Nova Land's customer, receivables, banking, and financial information during underwriting and servicing and knew that interference with account debtors could deprive Nova Land of operating cash and destroy customer goodwill.

66. Defendants' customer-directed collection activity aggravated the disclosed liquidity crisis by blocking the very receivables Nova Land needed for payroll, vendors, insurance, equipment, and project performance. It also threatened additional customer losses like D.R. Horton, further reducing Nova Land's ability to remain a going concern and resolve obligations with creditors.

**B. The Rocket Transaction**

67. On June 8, 2026, Rocket and Nova Land executed a standard-form "Agreement for the Purchase and Sale of Future Receipts" (the "Rocket Agreement").

68. Rocket agreed to provide a $325,000 stated purchase price, deducted a $13,000 origination fee, and disbursed $312,000 net to Nova Land.

69. In exchange, Rocket required Nova Land to deliver $487,175—$175,175 more than the net amount Nova Land actually received.

70. The Rocket Agreement fixed the initial weekly withdrawal at $13,532.64. Dividing the purchased amount by the fixed weekly withdrawal yields exactly thirty-six weeks.

71. The agreement's ACH authorization also permitted weekday withdrawals and proportional changes between daily and weekly frequencies, further subjecting Nova Land's operating account to Rocket's control.

72. Using the thirty-six-week payoff stated on the face of the transaction, the $175,175 finance charge on the $312,000 net advance yields a conservative annualized simple rate of approximately 81.1%.

73. That rate excludes contingent default interest, a 33% charge characterized as reasonable damages, a minimum $7,500 default charge, collection costs, and other fees.

74. The Rocket Agreement stated a 6.52% purchased percentage but did not set the initial withdrawal at 6.52% of contemporaneous receipts. Rocket calculated and imposed a fixed dollar withdrawal based on historical information under Rocket's control.

75. The Rocket Agreement allowed reconciliation upon request, but Rocket controlled the document review, calculated adjustments using historical statements, and retained discretion over timing and implementation.

76. The reconciliation language did not prevent Rocket from treating five failed ACH withdrawals, changes to banking arrangements, or interference with debits as defaults, nor did it prevent Rocket from accelerating and directly collecting the claimed balance from account debtors.

77. The Rocket Agreement granted Rocket a blanket security interest, broad bank access, a personal guaranty from Siegrist, and authority after claimed default to notify account debtors and collect receivables directly.

78. The Rocket Agreement gave Nova Land early repurchase options of $370,500 within sixty days and $390,000 within ninety days. Those date-certain payoff figures confirm that the parties contemplated repayment over a finite period rather than an indefinite sharing of receivables risk.

79. Nova Land's bank records reflect Rocket withdrawals of $13,532.64 on June 11, 2026; $8,119.58 on June 18, 2026; $13,532.64 on June 25, 2026; and $13,532.64 on July 2, 2026, among other collections to be established through an accounting.

80. Nova Land's contemporaneous MCA balance worksheet records a Rocket balance of $263,282.50. Rocket has not provided Plaintiffs a transparent transaction-level accounting reconciling all amounts funded, withdrawn, credited, charged, assigned, or demanded.

**C. Rocket and Regain Target Locust Branch**

81. Rocket retained or authorized Regain Group, LLC ("Regain") to collect the Rocket Agreement and to communicate with Nova Land's account debtors.

82. On July 24, 2026, Regain, identifying itself as Rocket's authorized agent, served Locust Branch with a UCC notice of assignment.

83. The notice asserted that Rocket held a perfected security interest under a UCC-1 filed June 8, 2026 and that $438,457.50 was then due and owing.

84. Regain directed Locust Branch to hold all funds otherwise payable to Nova Land until the demanded amount had accrued and then remit those funds to Regain.

85. The all-funds direction was not limited to 6.52% of Locust Branch's payments, the percentage Rocket claimed to have purchased.

86. The $438,457.50 demand exceeded Nova Land's contemporaneous Rocket balance record by approximately $175,175 and was not accompanied by a transaction-level accounting explaining the discrepancy.

87. By letter dated August 14, 2026, Locust Branch's counsel advised that Locust Branch would comply with the notice absent Nova Land's written objection within ten days, although Locust Branch separately disputed owing Nova Land any amount.

88. Rocket's notice therefore clouded and obstructed Nova Land's ability to resolve and collect a substantial commercial receivable and gave Nova Land's litigation adversary additional leverage.

**D. The Nitro Transaction**

89. On July 9, 2026, Nitro and Nova Land executed a standard-form "Sale of Future Receipts Agreement" (the "Nitro Agreement").

90. Nitro stated a purchase price of $80,000, deducted an $8,000 origination fee and a $25 wire fee, and disbursed $71,975 net to Nova Land.

91. In exchange, Nitro required Nova Land to deliver $120,000—$48,025 more than the net amount Nova Land actually received.

92. The face of the Nitro Agreement set an initial periodic withdrawal of $12,000 every business day, Monday through Friday, and a purported purchased percentage of 6%.

93. At that daily rate, the full $120,000 would be collected in exactly ten business days. The resulting conservative simple annualized rate on the net advance exceeds 1,700%.

94. A contemporaneous weekly-payment addendum stated that the payment frequency would be weekly and would automatically switch to daily after an unsuccessful weekly payment. Even on a ten-week schedule, the annualized simple rate on the net advance is approximately 347%.

95. Nitro also offered date-certain early payoff amounts of $108,000 within twenty business days and $116,000 within thirty business days, confirming that both parties contemplated a finite payoff.

96. The Nitro Agreement allowed a reconciliation request at any time, but Nitro controlled verification, could demand additional documentation and account access, and made changes only prospectively after its review.

97. The Nitro Agreement did not require automatic, contemporaneous adjustment of each withdrawal to 6% of actual receipts and did not obligate Nitro to bear a genuine risk that the purchased amount would not be collected.

98. Nitro received notice that Nova Land's receipts had materially declined because a general contractor failed to pay nearly $1 million and that Nova Land could not sustain Nitro's fixed $12,000 withdrawals. Nitro did not reduce each withdrawal to 6% of actual receipts or accept the risk of slower or incomplete collection.

99. Instead, the Nitro Agreement made the specified percentage 100% upon breach, accelerated the full undelivered amount, added a 25% breach fee, added a $5,000 default fee, authorized debits from any Nova-controlled account, granted a blanket security interest, and imposed Siegrist's personal guaranty.

100. The agreement also restricted Nova Land's ability to change accounts, obtain additional financing, sell assets, or interfere with Nitro's debits—ordinary lender protections inconsistent with a buyer's assumption of receivables risk.

101. Nova Land's July bank statement confirms Nitro's $71,975 incoming wire and later $12,000 debit attempts on July 16, July 23, and July 30, 2026.

102. Nova Land's August records reflect additional $12,000 debit attempts on August 6 and August 13, 2026 and a separate $499.99 debit attempt on August 10, 2026. Corresponding returns show that the large withdrawals repeatedly exceeded available operating funds.

103. Nova Land's contemporaneous MCA worksheet records a Nitro balance of $80,000. Nitro has not provided a transparent transaction-level accounting reconciling its funded amount, attempted withdrawals, returned items, fees, claimed balance, and any account-debtor collections.

**E. Nitro and Its Collection Arm Strike Carry Out Their Threatened Campaign**

104. Nitro retained Strike to serve as the Nitro–Strike Enterprise's collection arm and to collect the Nitro Agreement through UCC, asset-restraint, account-debtor, and reputational pressure.

105. Nitro supplied Strike with Nova Land's agreement, claimed debt, business information, personal-guarantor information, and collection authority. Strike then exercised independent discretion over the wording, recipients, timing, and methods of the collection campaign.

106. On August 11, 2026, after Nova Land had disclosed its reduced receipts and inability to sustain the fixed withdrawals, Strike sent a written ultimatum on Nitro's claim to Siegrist and at least twenty-five other addresses.

107. The recipient list included addresses belonging to or associated with Siegrist's two children, her former husband, her son's girlfriend, other relatives, and acquaintances. Siegrist had used only her Nova Land email address in communications with Nitro and did not provide the family addresses for any legitimate collection purpose.

108. Nitro, through Strike, used the mass family dissemination as a coercive and extortionate collection tactic calculated to embarrass and humiliate Siegrist, alarm her children and relatives, and increase personal pressure to pay a purportedly commercial obligation.

109. The August 11 email declared that all amicable options were exhausted, stated that Strike was bypassing ordinary collection efforts, and announced an aggressive, targeted UCC campaign to "freeze [Nova Land's] operational cash flow."

110. Strike threatened blanket UCC-1 filings against all business assets, freezes and diversion of merchant-account revenue, disruption of credit lines, seizure and liquidation of property, and emergency orders to freeze and drain operating bank accounts.

111. Strike warned that its campaign would halt Nova Land's daily operations and cause its ability to borrow, trade, or process payments to "terminate." It imposed a twenty-four-hour deadline and threatened to move the file to "active asset liquidation" unless payment was made.

112. The ultimatum did not offer to accept 6% of diminished receipts or acknowledge any risk that receipts might remain low. It demanded payment of a debt and threatened destruction of Nova Land's business if that debt was not paid, confirming that Nitro and Strike treated the entire obligation as absolutely repayable.

113. Nitro and Strike then followed through on the threatened campaign. They used or caused UCC and account-debtor communications to reach Nova Land's customers, including D.R. Horton, and to direct or induce those customers to withhold Nova Land's receivables.

114. D.R. Horton's legal department advised that it would follow the MCA/UCC correspondence until it received rescission, a release, or a court order.

115. D.R. Horton withheld approximately $40,000, removed Nova Land from work then in progress, and blocked Nova Land from future work.

116. The resulting loss of a three-year approved-vendor relationship producing approximately $1.037 million in annual revenue accomplished the business destruction Strike

had threatened: Nova Land lost immediate cash, active projects, future work, goodwill, and the revenue stream used to fund day-to-day operations.

117. On or about August 7, 2026, a third-party negotiator circulated an email referring to a purported Nitro UCC-lien release. Plaintiffs have not received a complete, authenticated accounting establishing that all Nitro notices were withdrawn, that all recipients accepted any release, or that the customer damage was repaired.

118. Even if Nitro later authorized a partial release, the earlier interference had already caused withheld payments, termination of work, loss of goodwill, and prospective lost revenue.

**F. The Immediate Transaction**

119. On June 18, 2026, Immediate and Nova Land executed Immediate's standard-form receivables-purchase agreement.

120. Immediate stated a $200,000 purchase price, deducted a $12,000 origination fee, and disbursed $188,000 net. It required delivery of $298,000 through fixed weekly withdrawals of $12,956.52 every Monday.

121. The fixed arithmetic produced an exact twenty-three-week term. The $110,000 difference between the required delivery and net cash, annualized over that term, yields a conservative simple rate of approximately 132.3%.

122. Immediate also took bank-control rights, a blanket security interest, default remedies, and Siegrist's guaranty.

123. After Nova Land disclosed that a developer had failed to pay nearly $1 million, that employees and creditors were not being paid, and that it needed a pause or grace period, Immediate responded that Nova Land was "two weeks behind on remittance" and threatened to "escalate this advance."

### G. The CFG Transaction

124. On April 16, 2026, CFG and Nova Land executed CFG's standard-form receivables-purchase agreement.

125. CFG stated a $400,000 purchase price and a $528,000 purchased amount, with fixed daily withdrawals of $4,099.80 or fixed weekly withdrawals of $20,499.

126. CFG deducted a prior CFG balance of $215,530 and a $199 fee, leaving only $184,271 in new cash from the transaction.

127. Using even the full $400,000 stated purchase price as the principal base, the exact approximately 25.76-week schedule produces a conservative annualized simple rate of approximately 64.6%. Using the new cash actually delivered after refinancing would yield a far higher rate.

128. CFG took ACH control, a blanket security interest, a personal guaranty, fixed default remedies, and reconciliation rights controlled by CFG's review and implementation.

### H. The Aspire Transaction and Automated Default Admission

129. On June 22, 2026, Aspire and Nova Land executed Aspire's standard-form receivables-purchase agreement.

130. Aspire stated a $150,000 purchase price, deducted $15,185 in UCC, wire, origination, and processing charges, and disbursed $134,815 net. It required delivery of $223,500 through fixed weekly withdrawals of $9,316.83.

131. The fixed arithmetic produced an approximately twenty-four-week term. The $88,685 finance charge on net cash, annualized over that term, yields a conservative simple rate of approximately 142.6%.

132. Aspire's form purported to offer reconciliation, but after breach it allowed Aspire to raise the purchased percentage to 100%, accelerate the full undelivered purchased amount, charge a $2,500 breach fee, debit all accounts, and enforce Siegrist's guaranty.

133. On August 21, 2026, Aspire's automated email identified one $9,316.83 payment returned two days earlier for insufficient funds and declared that the returned fixed payment was "a breach of your obligations."

134. The automated message threatened referral to Aspire's in-house legal team for "default and breach of contract," added an NSF fee to Aspire's balance, and ordered Nova Land to ensure funds were available for the next fixed payment.

135. Only after declaring breach and threatening default did Aspire mention possible reconciliation based on two months of statements plus month-to-date records. Aspire's programmed response treated a single insufficient-funds return as default because Aspire expected the fixed weekly payment regardless of actual receipts.

**I. The Arcadia Transaction**

136. On May 26, 2026, Arcadia and Nova Land executed Arcadia's standard-form receivables-purchase agreement.

137. Arcadia stated a $41,237.11 purchase price, deducted a $1,237.11 origination fee, and disbursed $40,000 net. It required delivery of $57,731.95 through fixed weekly withdrawals of $2,886.60.

138. The fixed arithmetic produced an exact twenty-week term. The $17,731.95 finance charge on net cash, annualized over that term, yields a conservative simple rate of approximately 115.3%.

139. Arcadia took a personal guaranty, blanket lien, ACH control, and authority to notify and collect from account debtors, including collection powers exercisable without a judicial determination of default.

**J. The Global/Wall Street Funding Transaction**

140. On January 28, 2026, Global, doing business as Wall Street Funding, and Nova Land executed Global's standard-form receivables-purchase agreement.

141. Global stated a $300,000 purchase price, deducted $4,535 in origination and wire charges, and disbursed $295,465 net. It required delivery of $390,000 through fixed weekly withdrawals of $7,500.

142. The fixed arithmetic produced an exact fifty-two-week term. The $94,535 finance charge on net cash, annualized over that term, yields a conservative simple rate of approximately 32.0%.

143. Although Global's form stated that an NSF caused by diminished receipts after notice would not itself be default, Global's collection communications pressured Nova Land for fixed payments and escalation rather than accepting the loss of purchased receipts. The actual administration, not the label, governs.

**K. The Transactions Are Loans in Substance**

144. New York law evaluates the real character of a transaction rather than the name, color, or form selected by the drafter. *Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320, 334 (2021).

145. Courts commonly consider whether reconciliation is genuine, whether the agreement has a finite term in substance, and whether the funder has recourse if the merchant's

business fails. *Fleetwood Servs., LLC v. Richmond Cap. Grp. LLC*, 2023 WL 3882697, at *2 (2d Cir. June 8, 2023).

146. Those factors are practical, not talismanic. The totality of the parties' rights and actual performance controls, including whether fixed withdrawals are a good-faith estimate of receipts and whether default provisions make repayment absolute. *People v. Richmond Capital Grp. LLC*, 246 A.D.3d 585, 586–87 (1st Dep't 2026).

147. Here, Defendants' withdrawals were fixed dollar amounts that produced exact payoff periods and were not automatically adjusted to contemporaneous receipts.

148. Here, Defendants preserved discretion over reconciliation inputs and implementation while retaining default remedies that became more severe when Nova Land's receipts or account balances declined.

149. The distinction became concrete when Nova Land's general contractor failed to pay nearly $1 million. Nova Land's receivables fell, subcontractors and suppliers recorded property liens, and Nova Land entered litigation to recover the missing revenue.

150. Nova Land told the Funder Defendants that the downturn had occurred and that actual receipts could not support their fixed withdrawals. Instead of sharing that risk through contemporaneous percentage-based adjustments, the Funder Defendants demanded the same fixed sums, declared or threatened default, and escalated collection of the full balances.

151. Here, date-certain early payoff schedules, fixed withdrawal mathematics, personal guaranties, blanket liens, cross-account access, financing restrictions, acceleration, and direct account-debtor collection created de facto finite and absolutely repayable obligations.

152. Defendants' actual collection conduct confirms the loan character: they demanded fixed balances, declared defaults, threatened destruction of Nova Land's business, used family-

wide dissemination to pressure Siegrist, threatened seizure and bank restraints, and directed account debtors to hold or divert all funds rather than the stated purchased percentages.

153. In *NewCo Capital Group VI LLC v. SPE Trading, Inc.*, 250 A.D.3d 1641 (4th Dep't 2026), the court enforced an agreement with mandatory retrospective and prospective reconciliation, no finite term, and no recourse for bankruptcy. The challenged transactions are materially different because their fixed mathematics, finite schedules, acceleration clauses, guaranties, account controls, and collection conduct made repayment absolute in substance.

154. Conversely, *EBF Holdings, LLC v. Defiant Arms LLC*, 2026 N.Y. Slip Op. 04563 (4th Dep't July 24, 2026), recognized a triable usury issue where the periodic payment was not a good-faith estimate and the guaranty and default structure shifted business-failure risk back to the merchant.

155. The challenged terms are at least as lender-protective as the agreements held or alleged to be loans in *Davis v. Richmond Capital Group, LLC*, 194 A.D.3d 516, 517 (1st Dep't 2021), *Richmond Capital*, and *Togut v. eProdigy Financial, LLC (In re Kossoff PLLC)*, 2026 Bankr. LEXIS 1850, at *20–45 (Bankr. S.D.N.Y. July 27, 2026).

**L. The Loans Are Criminally Usurious and Void**

156. New York Penal Law § 190.40 prohibits knowingly charging or receiving interest above 25% per year on a loan or forbearance.

157. A corporation may assert criminal usury, and a criminally usurious loan is void from inception under General Obligations Law §§ 5-511 and 5-521(3). *Adar Bays*, 37 N.Y.3d at 333–34.

158. Fees retained or exacted as a condition of funding are included when calculating interest. The $13,000 Rocket origination fee and Nitro's $8,000 origination fee and $25 wire fee therefore reduce the principal actually available to Nova Land.

159. Rocket's conservative annualized simple rate of approximately 81.1% exceeds the criminal-usury ceiling by more than three times.

160. Nitro's conservative weekly annualized simple rate of approximately 347% exceeds the ceiling by nearly fourteen times; the agreement's stated daily schedule produces a rate above 1,700%.

161. Immediate's approximately 132.3% rate, CFG's conservative approximately 64.6% rate, Aspire's approximately 142.6% rate, Arcadia's approximately 115.3% rate, and Global's approximately 32.0% rate likewise exceed 25%.

162. For Immediate and Aspire, their selected Florida law independently treats interest exceeding 25% per annum as criminal usury. Fla. Stat. § 687.071. The same transactions exceed Florida's 18% civil-usury limit for obligations of $500,000 or less. Fla. Stat. §§ 687.02–.03.

163. The rates are apparent from Defendants' own written terms and reflect knowing, intentional pricing rather than arithmetic mistake.

164. Because the loans are criminally usurious, the agreements, guaranties, ACH authorizations, security interests, financing statements, default charges, and collection directives dependent on them are void and unenforceable.

**M. The Separate Collection Enterprises**

165. Nitro and Strike formed an association-in-fact enterprise (the "Nitro–Strike Enterprise") with the common purpose of servicing and collecting Nitro's MCA obligations

through interstate communications, ACH systems, credit information, UCC filings, and account-debtor pressure.

166. Rocket and Regain formed a separate association-in-fact enterprise (the "Rocket–Regain Enterprise") with the common purpose of servicing and collecting Rocket's MCA obligations through interstate communications, ACH systems, UCC filings, and direct account-debtor demands.

167. Each remaining Funder Defendant participated in its own separate association-in-fact collection enterprise with the brokers, servicers, ACH processors, UCC agents, collection personnel, and account-debtor channels used to originate, administer, and collect its transaction (collectively, the "Additional Collection Enterprises").

168. Upon information and belief, those enterprises included Immediate and RBF Management or its servicing agents; CFG and its servicing and payment-processing agents; Aspire and the Fundible-linked addresses copied on its automated default email or other servicing agents; Arcadia and its ACH, UCC, and collection agents; and Global and the servicing, payment-processing, and collection agents through which it operated Wall Street Funding.

169. Each enterprise had relationships among its members, a common collection purpose, and sufficient longevity to originate or receive a file, review contract and debtor data, issue notices, communicate with customers, receive or direct payments, and maintain collection activity.

170. Each named Defendant is a RICO person distinct from the relevant association-in-fact enterprise. The nonparty enterprise participants had their own personnel, communications systems, contractual roles, expertise, decision-making, and economic interests.

171. Nitro operated or managed the Nitro–Strike Enterprise by selecting the debt for collection, supplying the agreement, claimed balance, debtor and guarantor data, and customer information, authorizing collection, and accepting the campaign's resulting leverage and benefits.

172. Strike operated or managed the Nitro–Strike Enterprise as its collection arm by receiving and reviewing Nitro's file, selecting the ultimatum's language and recipients, locating and contacting family and personal addresses, choosing UCC and asset-restraint threats, and carrying the campaign into Nova Land's customer relationships.

173. Rocket operated or managed the Rocket–Regain Enterprise by declaring default, supplying Regain with the agreement, balance and account-debtor information, authorizing the all-funds demand, and accepting the resulting leverage and collection benefits.

174. Each other Funder Defendant operated or managed its Additional Collection Enterprise by setting the fixed obligation and default rules, supplying merchant and guarantor data, directing ACH and servicing activity, deciding whether to reconcile or declare default, and accepting payments and collection benefits.

175. Greenwald operated or managed the Nitro enterprise by exercising authority over Nitro's transaction structure, fixed-debit and default policies, servicing, disclosure of debtor and family information, engagement of Strike, and escalation to UCC and account-debtor collection.

176. Rosenblum operated or managed the Rocket enterprise by exercising managerial authority over Rocket's transaction structure, fixed withdrawal, reconciliation, default, syndication, and authorization of UCC and account-debtor remedies, including the Regain demand to Locust Branch.

177. Kruzhkov operated or managed the Immediate enterprise by exercising member authority over Immediate's transaction structure, fixed weekly remittance, reconciliation, default, syndication, and escalation practices.

178. Coon and Gallagher operated or managed the CFG enterprise by exercising executive and ownership authority over CFG's transaction structure, refinancing deductions, fixed remittances, reconciliation, default, syndication, servicing, and collection practices.

179. Lenefsky operated or managed the Aspire enterprise by exercising chief-executive authority over Aspire's transaction structure, automated payment monitoring, one-payment breach policy, reconciliation sequence, default remedies, syndication, and legal escalation.

180. Karp operated or managed the Arcadia enterprise by exercising chief-operating authority over Arcadia's transaction structure, payment processing, reconciliation, default, syndication, UCC servicing, and account-debtor collection practices.

181. Keller operated or managed the Global enterprise by exercising founder and chief-executive authority over Global's transaction structure, fixed remittances, reconciliation, default, syndication, servicing, enforcement affidavits, and collection practices.

182. The Doe Syndicates participated in the operation or management of the applicable enterprises by committing and allocating capital, approving or accepting deal criteria and return structures, purchasing participation interests, monitoring merchant performance and collections, deciding or influencing whether capital remained committed, and receiving distributions derived from the challenged obligations.

183. Without the Doe Syndicates' capital commitments and participation purchases, the Funder Defendants could not have originated the challenged transactions at the funded amounts. The Doe Syndicates' expected returns depended on collection of the fixed purchased

amounts, fees, and default recoveries, aligning their economic interests with the enterprises' collection of the unlawful debts.

184. The Individual Defendants and Doe Syndicates knew the material economics from the face of the agreements, funding schedules, participation records, and collection reports: the net amounts advanced, fixed withdrawals, finite payoff periods, purchased amounts, fees, and default enhancements. The rates were not hidden arithmetic errors; they were the intended returns that the controllers approved and the syndicates funded.

185. Each enterprise affected interstate commerce by funding a Florida business from or through New York, using interstate wires and ACH networks, transmitting notices across state lines, and targeting interstate commercial receivables.

186. Upon information and belief, each challenged loan was incurred in connection with the applicable Funder Defendant's regular business of lending money or things of value through similarly structured MCA agreements.

**<u>COUNT I</u>**
**(Civil RICO—Collection of Unlawful Debt, 18 U.S.C. §§ 1962(c) and 1964(c))**

187. Plaintiffs repeat and reallege each preceding paragraph as if fully set forth herein.

188. The obligations the Funder Defendants originated and Defendants collected are "unlawful debt" under 18 U.S.C. § 1961(6) because they are unenforceable under the applicable state usury laws, were incurred in connection with the Funder Defendants' business of lending money or things of value, and carry rates more than twice the applicable enforceable rates.

189. Nitro, a RICO person, was employed by or associated with the Nitro–Strike Enterprise and knowingly conducted or participated in that enterprise's affairs through collection of the Nitro unlawful debt.

190. Strike, a RICO person and the Nitro–Strike Enterprise's collection arm, was employed by or associated with that enterprise and knowingly conducted or participated in its affairs by designing and executing the August 11 ultimatum, disseminating it to family and personal contacts, and implementing UCC and account-debtor pressure to collect the Nitro unlawful debt.

191. Rocket, a RICO person, was employed by or associated with the Rocket–Regain Enterprise and knowingly conducted or participated in that enterprise's affairs through collection of the Rocket unlawful debt.

192. Immediate, CFG, Aspire, Arcadia, and Global, each a RICO person, were employed by or associated with their respective Additional Collection Enterprises and knowingly conducted or participated in those enterprises' affairs through collection or attempted collection of their respective unlawful debts.

193. Each Individual Defendant was employed by or associated with the enterprise corresponding to the MCA company he controlled and knowingly conducted or participated, directly or indirectly, in that enterprise's affairs through the collection or attempted collection of unlawful debt. Each exercised actual authority over the transaction structures, funding, fixed-remittance, reconciliation, default, servicing, syndication, or collection practices alleged above.

194. The Doe Syndicates were associated with the applicable enterprises and knowingly conducted or participated, directly or indirectly, in their affairs by providing necessary capital, approving or accepting deal and return criteria, purchasing participation interests, monitoring performance, and receiving distributions derived from collection of the unlawful debts.

195. The Doe Syndicates' identities and precise participation percentages are presently concealed within Defendants' funding, syndication, servicing, bank, and distribution records. Plaintiffs will amend this Complaint to substitute their true names when discovery identifies them.

196. The collection acts included interstate funding and ACH debits, fixed-balance demands, default notices, blanket-lien assertions, communications to customers, dissemination to Siegrist's family and personal contacts, threats to destroy Nova Land's operations and freeze and liquidate assets, and directions that account debtors hold or divert Nova Land's money.

197. For a RICO claim based on collection of unlawful debt, Plaintiffs need not allege two predicate acts or a pattern of racketeering activity; the statute independently prohibits conducting an enterprise through collection of unlawful debt.

198. Nova Land suffered direct injury to its business and property by reason of each Defendant's violation, including unlawful payments and fees, withheld receivables, loss of use of operating funds, loss of customer work and goodwill, professional expenses incurred to release funds and protect customers, and lost profits.

199. Siegrist has incurred business and property injury to the extent she personally paid, guaranteed, secured, or expended funds to respond to the unlawful collection activity. She does not seek emotional-distress damages under RICO.

200. Under 18 U.S.C. § 1964(c), Plaintiffs are entitled to threefold their recoverable damages, costs, and reasonable attorneys' fees. Any restitution or setoff necessary to prevent a windfall can be determined after a complete accounting.

**COUNT II**

**(Declaratory Judgment, Recharacterization, Criminal Usury, and Cancellation)**

201. Plaintiffs repeat and reallege each preceding paragraph as if fully set forth herein.

202. An actual controversy exists because Defendants claim enforceable rights to fixed balances, guaranties, bank withdrawals, collateral, and account-debtor payments, while Plaintiffs contend the transactions are void criminally usurious loans.

203. All seven transactions are loans in substance because repayment was finite and absolute, reconciliation was not a genuine allocation of receivables risk, the Funder Defendants retained recourse against Nova Land, Siegrist, bank accounts, assets, and account debtors, and their actual administration treated fixed payments and balances as mandatory despite diminished receipts.

204. The loans' annualized rates substantially exceed 25%. The New York-governed loans violate Penal Law § 190.40; Immediate's and Aspire's loans violate Florida Statutes § 687.071 and, alternatively, §§ 687.02–.03.

205. Under General Obligations Law § 5-511 and the applicable Florida usury remedies, the Court should declare the agreements and dependent instruments void or otherwise grant the cancellation, forfeiture, restitution, and other relief supplied by the governing law.

206. The declaration should extend to Siegrist's guaranties, the ACH authorizations, default fees, security interests, financing statements, assignments, account-debtor notices, and any claimed right to collect or divert Nova Land's receipts.

207. Plaintiffs are entitled to an accounting of every amount funded, withheld, debited, returned, received, assigned, charged, credited, demanded, or collected under the challenged instruments.

## COUNT III
## (Tortious Interference with Contract and Business Relations)

208. Plaintiffs repeat and reallege each preceding paragraph as if fully set forth herein.

209. Nova Land had valid contracts and established business relationships with D.R. Horton, Locust Branch, and other customers and account debtors.

210. Defendants knew of those relationships through underwriting, bank and receivables records, UCC filings, and targeted collection communications.

211. Nitro intentionally interfered with the D.R. Horton relationship by authorizing or ratifying collection pressure and UCC communications designed to cause the customer to withhold all funds and stop doing business with Nova Land.

212. Greenwald intentionally authorized, directed, or ratified Nitro's use of Strike and the resulting family, UCC, and account-debtor campaign, despite knowing that its announced object was to halt Nova Land's operations and that interference with D.R. Horton would deprive Nova Land of current and future work.

213. Strike intentionally interfered with the D.R. Horton relationship as the Nitro–Strike Enterprise's collection arm by implementing Nitro's threatened UCC and account-debtor campaign after announcing that the campaign would halt Nova Land's operations.

214. Rocket intentionally interfered with the Locust Branch relationship by directing that customer to hold all Nova Land funds until $438,457.50 accrued and then pay Regain, notwithstanding the stated 6.52% purchase and the substantial unexplained balance discrepancy.

215. Rosenblum intentionally authorized, directed, or ratified Rocket's use of Regain and the all-funds demand to Locust Branch through his managerial control over Rocket's default and account-debtor collection policies.

216. Defendants used wrongful means, including collection of criminally usurious debt, enforcement of void security interests, overbroad all-funds demands, threats of asset

restraints without established judicial process, and commercially unreasonable pressure calculated to disable Nova Land's operations.

217. The interference caused withheld payments, removal from active work, loss of future work, impaired settlement and collection of receivables, lost goodwill, professional expenses, cash-flow disruption, and lost profits.

218. Defendants acted intentionally, maliciously, and with reckless disregard of Plaintiffs' rights, warranting compensatory and punitive damages and injunctive relief to the fullest extent permitted by law.

## COUNT IV
### (Breach of UCC Duties and the Covenant of Good Faith—Against the Funder Defendants)

219. Plaintiffs repeat and reallege each preceding paragraph as if fully set forth herein.

220. This claim is pleaded in the alternative if any challenged security interest is found valid and enforceable.

221. New York UCC § 1-304 imposes an obligation of good faith in the performance and enforcement of every UCC-governed contract or duty.

222. Under UCC § 9-607(c), a secured party that undertakes to collect or enforce an account-debtor obligation and retains recourse against the debtor must proceed in a commercially reasonable manner.

223. Rocket breached those duties by demanding that Locust Branch hold and remit all funds until an unexplained $438,457.50 demand accrued, rather than limiting collection to the stated purchased percentage or a substantiated enforceable balance.

224. Nitro breached those duties by using Strike to conduct a targeted campaign threatening business destruction, freezes, credit disruption, liquidation, and bank levies within twenty-four hours; disseminating the demand to Siegrist's children, former husband, her son's

girlfriend, and other unrelated personal contacts; and following through with UCC and account-debtor pressure.

225. Aspire breached the covenant by automatically declaring one insufficient-funds return a breach and threatening default before any genuine adjustment to actual receipts, while adding a fee and commanding that the next fixed payment be funded.

226. The Funder Defendants further breached those duties by using collection pressure inconsistent with the agreements' claimed nonrecourse sale character, refusing in practice to assume the disclosed decline in receipts, and failing to provide transparent accountings before enforcing fixed balances and remedies.

227. Under UCC § 9-625(a) and (b), Plaintiffs are entitled to appropriate injunctive relief and damages caused by the Funder Defendants' noncompliance, together with all other available relief.

**COUNT V**
**(Declaratory and Injunctive Relief Concerning UCC and Account-Debtor Collection)**

228. Plaintiffs repeat and reallege each preceding paragraph as if fully set forth herein.

229. Defendants have asserted, carried out, or threatened financing statements, payment notices, bank debits, account-debtor collection rights, and business-disabling restraints dependent on the challenged agreements.

230. Plaintiffs face ongoing and irreparable harm from continued or renewed notices, including loss of customers, destruction of goodwill, inability to bid or perform work, impaired access to operating cash, delayed payroll, loss of employees, threatened insurance cancellation, inability to meet equipment and project expenses, and destabilization of Nova Land's business as a going concern.

231. Those injuries cannot be fully repaired by a later damages award because lost approved-vendor status, customer confidence, project opportunities, and commercial reputation are difficult to quantify and restore.

232. Plaintiffs are likely to succeed because the fixed mathematics, excessive rates, default remedies, guaranties, refusal to accept the disclosed downturn risk, and actual all-funds collection conduct establish criminally usurious loans rather than true receivables purchases.

233. The balance of hardships favors Plaintiffs because an injunction would require Defendants to litigate disputed claims without destroying Nova Land's customer relationships, while continued unilateral diversion threatens Nova Land's survival.

234. The public interest favors enforcement of New York's criminal-usury laws and orderly judicial resolution of disputed secured claims rather than extrajudicial customer freezes based on void instruments.

235. Plaintiffs are entitled to preliminary and permanent injunctions requiring Defendants to withdraw all account-debtor notices, cease ACH debits and collection of the challenged obligations, notify recipients that prior diversion demands are rescinded, and file all termination statements or amendments necessary to release the asserted liens.

236. Any injunction should bind Defendants and their officers, agents, servants, employees, attorneys, collection agents, and all persons in active concert or participation with them who receive actual notice under Federal Rule of Civil Procedure 65(d).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request judgment in their favor and against Defendants as follows:

i. Declaring that the Immediate, Nitro, CFG, Rocket, Aspire, Arcadia, and Global transactions are loans, not true purchases of receivables;

ii. Declaring that the loans are criminally usurious, void ab initio, and unenforceable;

iii. Declaring that the guaranties, ACH authorizations, security interests, financing statements, assignments, default charges, and account-debtor notices dependent on the void loans are likewise void and unenforceable;

iv. Preliminarily and permanently enjoining Defendants and persons acting with them from debiting Plaintiffs' accounts, collecting the challenged obligations, sending or enforcing account-debtor notices, or directing customers to withhold or divert Nova Land's funds;

v. Directing Defendants to withdraw all account-debtor notices, notify every recipient that prior diversion demands are rescinded, and file all termination statements, amendments, and releases necessary to cancel the challenged UCC filings;

vi. Awarding Plaintiffs their recoverable actual damages, trebled under 18 U.S.C. § 1964(c), in an amount to be determined at trial;

vii. Awarding compensatory and punitive damages on the state-law claims to the fullest extent permitted by law;

viii. Awarding restitution and disgorgement of unlawful interest, fees, charges, and collection proceeds, subject to any accounting and setoff the Court deems equitable;

ix. Ordering a complete accounting of all funds advanced, withheld, debited, returned, credited, received, assigned, demanded, or collected;

x. Awarding pre- and post-judgment interest;

xi. Awarding Plaintiffs their costs, disbursements, and reasonable attorneys' fees under 18 U.S.C. § 1964(c) and other applicable law; and

xii. Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all claims and issues so triable.

Dated: New York, New York
September 8, 2026

HESKIN & PROPER, PLLC
By: /s/ Shane R. Heskin
Shane R. Heskin
641 Lexington Avenue, 14th Floor
New York, New York 10022
(917) 362-1313
shane@heskinproper.com
Attorney for Plaintiffs